83 N.J. Super. 65 (1964)
198 A.2d 826
FIDELITY UNION TRUST COMPANY, A TRUST COMPANY OF THE STATE OF NEW JERSEY; MARGARET BERENBLUM, HARRY POTOLSKY, AND SAMUEL BERENBLUM, AS EXECUTORS UNDER THE LAST WILL AND TESTAMENT OF HARRY BERENBLUM, PLAINTIFFS,
v.
MARGARET BERENBLUM, HARRY POTOLSKY, ARCHIE POTOLSKY, NATHAN POTOLSKY, MORRIS POTOLSKY, NAOMI KATZ, GERTRUDE TOBIAS, BERNICE VARON, HAROLD KATZ, SYLVIA COHEN, SAM BERENBLUM, ROSE BERENBLUM, MIRIAM YODOWITZ, ESTHER COOMBS, AND YETTA FIEDLER, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided March 6, 1964.
*68 Mr. Martin Roth, attorney for plaintiffs.
Mr. Harry Schaffer, attorney for defendant Margaret Berenblum.
Messrs. Kristeller, Zucker, Lowenstein & Cohen, attorneys for defendants counterclaimants Harry Potolsky, Archie Potolsky, Nathan Potolsky, Morris Potolsky, Naomi Katz, Gertrude Tobias, Bernice Varon, Harold Katz, Sylvia Cohen, Sam Berenblum, Esther Coombs and Yetta Fiedler (Mr. Saul Zucker, appearing).
HERBERT, J.S.C.
Harry Berenblum died on May 26, 1960. He left a will dated April 30, 1936 in which he named Fidelity Union Trust Company, his wife Margaret Berenblum and his nephews Harry Potolsky and Samuel Berenblum executors and trustees. There is a very substantial estate. Questions having arisen about the content of the estate and its proper distribution, the executors and trustees have brought this suit in which they, as well as other parties, seek a judgment of the court to answer those questions.

DISTRIBUTION  THE BEQUESTS TO CHAMKA LEVENSON
After listing a number of charitable gifts, the will creates a trust of the residue of the estate and directs that the trust income be paid during the lifetime of the testator's widow, one-half to her, one-fourth to the testator's sister "Chamka Levenson, of Chemsk, Poland," one-eighth to another sister Rachel Potolsky, and one-eighth to a brother Isaac Berenblum. At the widow's death the will orders the entire trust estate distributed 40% to Chamka Levenson, 30% to Rachel Potolsky and 30% to Isaac Berenblum (called "Ike" in the will).
*69 As already noted, the will was executed in 1936. The provisions for Chamka Levenson were never modified even though she and her husband were Jews and the town or village in which they lived was overrun by the German army in 1941 and held by the Germans for a considerable time thereafter. There is no evidence that Mr. Berenblum ever heard from his sister or her family, either directly or indirectly, after 1941. She has not come forward in person or proxy to claim her benefits under the will, nor has any descendant of hers.
Chomsk was within the borders of Poland when Hitler invaded that country in 1939. It is now in Soviet Russia, in the southern portion of the White Russian Soviet Socialist Republic. It is shown on present-day maps about 65 miles east northeast of the Polish-Russian border city of Brest (Brest-Litovsk). The name "Chomsk" appears to be correct, rather than the spelling "Chemsk" which is used in the will.
An extensive investigation has been made for the purpose of locating Chamka Levenson or any members of her household. Counsel for all parties participated in this. They cooperated with each other by exchanging such information as was obtained and in the planning of steps to be taken. Vigorous efforts were made to obtain permission from the Soviet Government to send a representative to Chomsk to make inquiries about the Levenson family, but such permission was refused. By correspondence, a woman named Valentina Levenson (Mrs. Gershko Levenson) was located at Brest. She answered the first inquiry addressed to her by stating that Chamka Levenson and her husband Schmuel "died during the war of 1942." She went on to say that the only one of the Levenson family who survived was her own husband, a son of Schmuel's brother Yankel. This exchange of correspondence took place between Valentina Levenson and Mr. Schaffer, attorney for Mrs. Margaret Berenblum. It was followed by a letter in which Mr. Schaffer submitted a list of questions which Mrs. Levenson answered. She had known Chamka Levenson, the wife of her husband's uncle Schmuel. *70 She saw her in 1940. The home of Chamka and her family was in the Village of Chomsk. There were five children, but Mrs. Valentina Levenson could remember only the name of one of the boys. Chamka Levenson, her husband and children were all shot to death in 1941 "by the fascists" in the Village of Osovtzi. Valentina Levenson went on to say that her information about the shooting came from stories of people who witnessed the killings.
Inquiries were also made about Chamka Levenson and her family in Israel through Yad Vashem, an organization which uses the descriptive designation "Martyrs' and Heroes' Memorial Authority." Assurance of the standing of Yad Vashem is found in the fact that its personnel and resources were used to some extent in assembling material for use at the trial of Adolf Eichmann. Through its efforts a man named Joseph Beder was located. He was born in Chomsk, had been there during a portion of the German occupation, had known the Levensons, and had first-hand knowledge of some of the murders of Jewish citizens committed by the Germans.
The attorneys for all parties as well as a representative of the corporate executor went to Israel to obtain directly from Mr. Beder all pertinent information he could give, as well as to hunt for other proofs and follow up any other indicated lines of inquiry that might appear to offer some hope of additional information. They reviewed there with representatives of Yad Vashem the statement which that organization had previously obtained from Mr. Beder and the next day met with him. No formal deposition was taken, but Mr. Beder was questioned much as though he were giving one and he did execute an affidavit verifying the statement or declaration which he had given to Mr. Alperovitz of Yad Vashem on August 1, 1962 about the Levensons. He also identified a group photograph showing Chamka Levenson, her husband, her daughter and four sons, taken in front of the Levenson home at Chomsk, and he swore that Chamka, the daughter Chaitcha and two of the sons were killed by the *71 Germans in July 1941, and that Schmuel (the father) and the other two sons were killed in May 1942, and that none of the children had ever married. Mr. Beder's affidavit concludes with this statement: "So far as I know, I am the only surviving Jewish person who lived in Chomsk, Poland during the 1941-1942 exterminations."
Although Mr. Beder said that all of the Levensons were murdered at Chomsk, but on two different occasions, and Mrs. Valentina Levenson has written from Russia that they were all killed on a single occasion in the Village of Osovtzi, both agree upon the essential fact that all members of the family were victims of the Germans.
At or about the time Mr. Beder was being interviewed advertisements were run in four Israeli newspapers seeking information about Chamka Levenson of Chomsk, Poland or about her children. These were printed in Hebrew, Yiddish, English and Polish. A man named Avraham Ben-Moshe was the only person who responded. He presented himself for an interview with all counsel and Mr. Sparkes of the Fidelity Union Trust Company. He claimed that his grandfather and Chamka Levenson's mother were brother and sister and that he knew the entire family. He at first said that there had been four children, but when shown the photograph identified by Mr. Beder, changed the number to five. He said that the eldest was the daughter, who was about his own age. He also said that he and an uncle had gone to Chomsk in 1945 or 1946, and while there had learned that every Jew had been wiped out, including the members of the Levenson family. He declared that this had been told to him by a priest at Chomsk and by former neighbors of the Levensons. His story would carry more weight if he had not asked for a share of the estate as a condition of signing a statement or affidavit.
Many other inquiries were made but for the most part yielded no worthwhile results and at best produced suggestions about other avenues to explore. A stipulation of facts filed in the cause lists a total of 49 possible sources of information to which questions were directed. In addition to *72 particular inquiries, counsel have made an extensive examination of published materials about German persecutions of the Jews in an effort to find pertinent references to Chomsk and the region in which it lies. This study confirmed the German occupation and the practice in eastern Poland, as elsewhere, of systematic murder. Had another part of the world been the last known home of the Levensons, an investigation could have been made on the spot, information assembled and depositions taken from witnesses having personal knowledge. That could not be done at Chomsk, however. The Soviet authorities refused permission for anyone connected with the preparation of this case to go there.
Some help in judging the proofs about the Levenson family is furnished by cases dealing with what has been called the "special peril" doctrine. A man is in a situation of danger and disappears. His body is not found and he is never heard from. His will may be probated or his life insurance collected without waiting for the passage of seven years of unexplained absence. Lukens v. Camden Trust Co., 2 N.J. Super. 214, 227 (Ch. Div. 1948), and other cases are collected in 34 A.L.R. 1389 and 61 A.L.R. 1327. When the Germans in the summer of 1941 occupied the region in which Chomsk was located, the Jews of that village were placed in extreme peril. They were in the control of men who intended to kill them all. There is nothing in the proofs to indicate Chamka Levenson, her husband, or any of her children escaped that peril. Mr. Beder and Valentina Levenson definitely say they did not. That nothing has been heard from them during the 20 years since the German occupation of Chomsk ended indicates they are all dead.
The children of Chamka Levenson were old enough by 1941 to have been informed about relatives in America in such a way as to enable each of them, if living at the end of the war, to get in touch with those relatives, even though Chamka and her husband had been killed during the German occupation. Yet they were apparently young enough, as indicated by the pre-war photograph already mentioned, to make it unlikely *73 that even the eldest might have married and had a child before being killed by the Germans. This case, therefore, has in it little or no suggestion of a possibility that a Levenson grandchild, saved as an infant when his parents died, could have grown up and be now living somewhere with no knowledge of family ties.
My conclusion is that Chamka Levenson and all the members of her immediate family died before the testator, having been murdered by the Germans at some time or times during the years 1941-1944.

DISTRIBUTION  IS THERE A PARTIAL INTESTACY?
This question arises as a result of the determination that Chamka Levenson and all of her descendants died before the testator. The residuary clause of the will creates a trust and makes gifts of income and principal to Mrs. Levenson. None of the will's language even suggests a gift over in the event the provisions for Mrs. Levenson or any other named beneficiary shall fail, and unless the statutes designed to prevent lapsing of testamentary gifts apply here, a partial intestacy exists.
Although the testator's sister Rachel Potolsky and his brother Ike Berenblum predeceased him, they each left descendants who outlived him. N.J.S. 3A:3-13 therefore applies to the gifts provided in the will for Mrs. Potolsky and Mr. Berenblum. Those gifts did not lapse, but vested in the descendants of the named donees in accordance with the provisions of the statute. Henney v. Ertl, 7 N.J. Super. 401 (Ch. Div. 1950), where a short history of what is now N.J.S. 3A:3-13 is given.
Comment about the disposition of the gifts allotted to Mrs. Potolsky and Mr. Ike Berenblum by the language of the will is merely an introduction to the real problem: What is to be done with the benefits which would have been Mrs. Levenson's had she outlived the testator? N.J.S. 3A:3-13 will not save from lapse the provisions for her. That section by its *74 terms applies only when a named devisee or legatee within a specified class dies and leaves a descendant, or descendants, who survives the testator. Before 1947 the subject matter of the gifts intended for Mrs. Levenson would have gone by intestacy. A short history of that rule is found in Skinner v. McCormick, 62 N.J. Super. 256, 260 (App. Div. 1960).
Then in 1947 New Jersey adopted the statute which is now N.J.S. 3A:3-14. It reads:
"When a residuary devise or bequest shall be made to 2 or more persons by the will of any testator dying after July 3, 1947, unless a contrary intention shall appear by the will, the share of any such residuary devisees or legatees dying before the testator and not saved from lapse by section 3A:3-13 of this title, or not capable of taking effect because of any other circumstance or cause, shall go to and be vested in the remaining residuary devisee or legatee, if any there be, and if more than 1, then to the remaining residuary devisees or legatees in proportion to their respective shares in said residue."
A reading of section 14 shows that if Mrs. Potolsky and Mr. Ike Berenblum had survived the testator, the gift of principal intended for Mrs. Levenson under the residuary clause would have gone to them. Each of them, in the words of section 14, would have been a "remaining residuary devisee or legatee." However, it is argued on behalf of the testator's widow that she is the sole heir at law and next of kin (N.J.S. 3A:4-1 and 3); that there is an intestacy; and that no descendant of Mrs. Potolsky or Mr. Ike Berenblum, even though such descendant happens to be entitled to a portion of his ancestor's devise or legacy under section 13, can be regarded as a "remaining residuary devisee or legatee" under section 14. Further, the widow contends the court should not, under the pretext of interpreting a statute, in fact rewrite section 14 as though the Legislature had directed expressly that a fractional share of the residue of a testamentary estate which would otherwise lapse "shall go to and be vested in the remaining residuary devisee or legatee [or in any descendant thereof entitled to take under N.J.S. 3A:3-13], if any there be * * *."
*75 The question under discussion appears to be a novel one in New Jersey. In Skinner v. McCormick, supra, N.J.S. 3A:3-14 was involved, but the testator there had been survived by a beneficiary named in the residuary clause of his will and it was possible to apply the statute literally in giving to that survivor the share of a residuary legatee who had predeceased the testator. The only reported case found which deals directly with our precise problem is Kammer v. Raver, 96 N.E.2d 439 (Ohio Probate Ct. 1950). There the testatrix gave the residue of her estate in equal shares to a sister and two brothers. She outlived one brother and her sister. Only the sister left issue. The court applied an Ohio statute having the same general objective as N.J.S. 3A:3-14 but differing somewhat in form, and as a result of that application divided in two parts the share which would have gone to the childless brother if he had survived the testatrix and gave one of those parts to the surviving brother and the other part to the issue of the sister. The statute in question provided that a residuary share which would otherwise lapse "shall pass to and vest in such other devisee or devisees surviving the testator in such proportions as the testamentary share of each devisee in the devised property bears to the total of the shares of all the surviving devisees, unless a different disposition be made or required by the will." The legislation from which this quotation is taken embodied in a single section the substance of both our section 13 and our section 14, and the Ohio court placed some emphasis on the consistency of giving to the children of the deceased sister their mother's stated share by force of one sentence of the statute and at the same time giving to them under another sentence of the same section a further share which their mother would have been entitled to had she lived.
The part of the opinion which is particularly pertinent to the result reached is the following paragraph (96 N.E.2d, at p. 441):
"The purpose of the statute is to prevent lapsing and the legislature certainly intended that the term devisee, whenever used therein, *76 should include issue of such devisee when such primary devisee predeceased the testator. Such issue of predeceased primary devisees are surviving devisees and take as substituted devisees and not as heirs of the primary deceased devisee. In other words, the phrase devisee or devisees surviving the testator, used in the second sentence of the statute, includes both primary devisees and also issue of predeceased primary devisees who survive the testator."
In re Burns' Estate, 78 S.D. 223, 100 N.W.2d 399 (Sup. Ct. 1960), involved a will which left the residue in equal shares to three sisters of the testatrix, all of whom predeceased her and only one of whom left descendants who survived the testatrix. The residuary clause expressly provided that upon the death of any of its beneficiaries the entire residue should be divided equally between the survivors. Although there had been no survivors, the court held that the anti-lapse statute of South Dakota required distribution of the entire residue to the lineal descendants left by one of the three beneficiaries. There is no helpful discussion in the opinion, however, as to why this ruling encompassed the entire residue rather than only the one-third share provided by the testator for the sister who left lineal descendants.
Counsel have furnished the text of the statement which was appended to the bill which became L. 1947, c. 380, and is now N.J.S. 3A:3-14. It reads:
"This bill is similar to the law of Pennsylvania as to possible lapsed gifts under a residuary clause, and avoids the situation where upon the death of one or more of the residuary devisees, there is an intestacy contrary to the intention of the testator."
Of course, it does not necessarily follow from this statement that the objective of the Legislature in preventing intestacy was effectively carried out in our case by the legislation adopted.
I have concluded, however, that an interpretation of N.J.S. 3A:3-14 is proper which gives to the descendants of Mrs. Potolsky and Mr. Ike Berenblum the same status that Mrs. Potolsky and Mr. Berenblum would have under that section if they had survived the testator. When N.J.S. 3A:3-14 *77 came up for legislative consideration in 1947, the statutory section which is now N.J.S. 3A:3-13 had been in effect for a long time. The Legislature, therefore, considered section 14 against a background of established law by which fractional gifts of a residue (as well as other legacies and devises) were saved from lapse if the donee named by the testator had left children or other descendants who outlived the testator. Section 13 does not purport to create new legacies or devises or other original rights in a descendant of a beneficiary named in a will. Rather it preserves the very same benefits which would have gone to the named devisee or legatee if he had lived. It contains this clause:
"* * * such devise or legacy shall not lapse but shall vest in any such child or descendant of a child of such devisee or legatee as if such devisee or legatee had survived the testator and died intestate."
It appears appropriate and accurate to say of section 13 of our statute  as the court did about the Ohio statute in Kammer v. Raver, supra  that a child or other descendant of a named donee who has died takes under it as a devisee or legatee, even though such taking is by a statutory substitution. It follows that the heirs of Mrs. Potolsky and Mr. Ike Berenblum, having been substituted as devisees and legatees by force of section 13 in place of their respective ancestors, should be regarded by virtue of that substitution as "the remaining residuary" devisees or legatees, called for by section 14, who are entitled to take the gift of principal allotted to Mrs. Levenson by the language of the will.
An interpretation of N.J.S. 3A:3-14 which gives the share of principal intended for Mrs. Levenson to the parties to this suit who are children of Mr. Ike Berenblum and to the children (and grandchildren by two deceased children) of Mrs. Potolsky is supported by some general principles of construction. In 96 C.J.S. Wills § 1219, p. 1062, the text says concerning legislation designed to prevent lapsing of testamentary dispositions: "In general, it is held that such statutes should receive a liberal construction so as to advance *78 the remedy and suppress the mischief resulting from the common-law rule as to lapse." A number of cases for this proposition are cited in the notes, and only one contra. The court in Giles v. Gassert, 23 N.J. 22, 33 (1956), though considering a statute unrelated to the present case, made a statement having pertinence here:
"The sense of a law is to be collected from its object and the nature of the subject matter, the contextual setting, and the statutes in pari materia; and the import of a particular word or phrase is controlled accordingly. Isolated terms cannot be invoked to defeat a `reasonable construction.' Wright v. Vogt, 7 N.J. 1 (1951). See also State v. Brown, 22 N.J. 405 (1956). The statute is to be liberally construed to advance the remedy, due regard being had to the protection of the Fund against fraud and abuse and to the fulfillment of the essential legislative policy. The literal sense of terms is not to have ascendancy over the reason and spirit of the expression as a whole."
Many other cases on the policy and purpose of a statute as an aid to interpretation are collected in 25 N.J. Digest, Statutes, p. 164 et seq.
The general purpose of adopting N.J.S. 3A:3-14 was to avoid intestacies by preventing the lapsing of residuary gifts. Cases dealing with wills have emphasized again and again the strength of the policy that intestacy should be avoided if possible. Although the present question is one of statutory interpretation rather than will construction, the same policy has been carried over into the construction of anti-lapse statutes. Wildberger v. Cheek's Executors, 94 Va. 517, 27 S.E. 441 (Sup. Ct. App. 1897), which quotes with approval from Nutter v. Vickery, 64 Me. 490, 498 (Sup. Jud. Ct. 1874). The purpose of N.J.S. 3A:3-14 and the strength of the policy behind the purpose combine to justify a construction of that section, when read in conjunction with N.J.S. 3A:3-13, as a comprehensive preventative of lapsing in any case in which a person, related to a testator within the degrees specified by statute, who is named as donee of part of the residue of an estate, has died but has left issue surviving the testator. By contrast, an interpretation of section 14 *79 limiting its application to those cases in which at least one residuary beneficiary named in a will survives the testator would necessarily involve the conclusion that the Legislature reached only in part the general objective of avoiding intestacies of fractional residuary shares; and that conclusion would be an unsatisfactory one because it falls short of achieving the full purpose behind the statute. In 3 Sutherland, Statutes and Statutory Construction (3d ed. 1943), § 5505, p. 41, the author writes:
"A large number of the decisions have come to recognize that a construction is preferred which is either strict or liberal with reference to the purposes and objects of the statute. This makes for the soundest analysis of the problem of liberal and strict construction. Thereunder, a statute is liberally construed when the letter of the statute is extended to include matters within the spirit or purpose of the statute; and a statute is strictly construed when the letter of the statute is narrowed to exclude matters, which if included would defeat the policy of the legislation and lend itself to absurdity."
The judgment to be entered on this opinion should provide that the trustees are to distribute at the appropriate time the share of principal intended for Chamka Levenson by dividing it into two equal parts and by turning over one part to the children of Ike Berenblum and the other part to the children and eligible grandchildren of Mrs. Potolsky. There is a difference, however, as to income shares. They, too, are a part of the residuary clause, and one beneficiary named by the testator  his wife Margaret  is still alive. Mrs. Levenson's 25% share of income is defined by the will as an estate or tenancy for the life of Mrs. Berenblum. It will not lapse but will be disposed of under N.J.S. 3A:3-14. It will be divided among (a) Mrs. Margaret Berenblum, she being a surviving beneficiary of residuary income named in the will, (b) the children of Mr. Ike Berenblum, and (c) the children and eligible grandchildren of Mrs. Potolsky. By the terms of the statute the division is to be "in proportion to their respective shares in said residue." As I calculate the result, two-thirds of 25% of the total trust income will be added to the *80 50% share of income given to Mrs. Berenblum by the language of the will; and one-sixth of 25% of the trust income will be added to each of the other two portions.
It is scarcely necessary to add that Mrs. Margaret Berenblum, though a surviving residuary beneficiary, has not been discussed in this opinion as a possible taker of principal under N.J.S. 3A:3-14 because the terms of the will make it clear the testator intended her interest in the residue to be limited to income for life. See Bankers Trust Co. v. N.Y. Women's League For Animals, 23 N.J. Super. 170 (App. Div. 1952). A brief comment will also dispose of the contention that the will is not subject to a statute passed after its execution. N.J.S. 3A:3-14 expressly applies to wills of testators "dying after July 3, 1947" and Mr. Berenblum's death occurred in 1960.

PARTIAL TERMINATION OF THE TRUST
The remaindermen who have taken an active part in the case seek a partial termination of the trust. They and all the members of their group are of age. With Mrs. Margaret Berenblum's being entitled only to a fraction of the trust income for her life, they argue she can be provided for by giving her the entire income upon that same fraction of the principal, thus making it proper and appropriate to distribute at once the balance of the principal to the persons who have a vested interest by way of remainder in it and who would be entitled to receive the income from it if it were held intact. Based on the decision I have reached about Mrs. Berenblum's share of income, this argument, if followed, would lead to the conclusion that two-thirds of the entire principal should be held by the trustees while she lives and she should be paid all of the income from it, and that the remaining one-third of principal can be paid out immediately. Partial termination of a trust has been approved. Fidelity Union Trust Company v. Birch, 121 N.J. Eq. 132 (Ch. 1936). In that case, however, the testator had specified that the trustees *81 should pay annuities of $7,500 and eventually pay certain legacies in specified amounts. To protect the annuitants and the legatees, $250,000 was held and the trust terminated only as to the balance of the fund. Fixed dollar amounts made it easy to protect adequately the interests entitled to protection.
If Mrs. Margaret Berenblum has taken a position on the record for or against partial termination, I am not aware of it. If she and all remaindermen will consent, immediate termination of the trust to the extent of one-third of the principal thereof will be approved. If she will not consent, the application for partial termination will be denied. The testator directed that his wife should have "fifty per cent of the net income from said residuary estate." That percentage has now been increased to 66.66 by the force of circumstances and the operation of N.J.S. 3A:3-14. In times of prosperity it is easy to say that two-thirds of the income of a substantial fund and the entire income from a fund two-thirds as large are substantially equivalent. Conditions may change, however, before the end of Mrs. Berenblum's life, and she may in the future be glad that her trustees had the greater opportunities for diversified investments and any similar advantages resulting from a larger rather than a smaller fund. Absent her consent, whatever risk of detriment to her may inhere in partial termination should not be forced upon her by the court, especially as her husband's intent to keep the whole fund intact for her life is clear from the terms of his will. Lockwood v. Clarke, 136 N.J. Eq. 195, 202 et seq. (Ch. 1945).

THE JOINT BANK ACCOUNT
When Harry Berenblum died there was on deposit with The Howard Savings Institution $27,181.97 in an account recorded on the bank's records in the names of Margaret Berenblum and Harry Berenblum, "payable to either or survivor." The account had been opened October 9, 1956. Was the balance in whole or in part an asset of the estate? It was not. The answer is dictated by Ward v. Marine National, *82 38 N.J. 132 (1962). Although that case was decided after the present suit had been started, there is no merit to the suggestion, made in argument, that it might be given prospective effect only. The real substance of the Ward ruling is that our statute governing rights in joint bank accounts (N.J.S.A. 17:9A-218) is valid and effective. Having been passed in 1954 it became at once the law of the State as to all newly opened accounts falling within its scope. It applies to the Berenblum account which was opened in 1956, and made Mrs. Berenblum the sole owner of that account the day her husband died.

THE NEGOTIABLE BONDS
Mrs. Margaret Berenblum claims ownership of negotiable bonds having a face value of $168,000. She asserts her husband gave these to her before his death. By counterclaim all of the defendants (other than Mrs. Berenblum) who have appeared in the cause charge there was no such gift and demand that the bonds be handled as assets of the estate.
The bonds had been kept at the Ironbound Branch of the Fidelity Union Trust Company in a safe deposit box rented by Mr. and Mrs. Berenblum. She testified they were taken out some time before her husband's death; that she was with him at the bank when he removed the bonds from the box, and they were carried home to West Caldwell in her knitting bag. Once there, they were placed in a tin box which was kept in the bottom of a corner cabinet in the dining room. She always had a key to the cabinet. She went on to say that after the bonds were brought to the Berenblum home they were not given to her immediately. She described how a nephew of hers from California paid her a visit in or about March 1960 and mentioned to her and her husband that his wife was "getting extravagant" by buying stocks. Mr. Berenblum then told his wife that she should not gamble with stocks. A little later on, about one and a half months before his death and when he was very ill, he reminded her of the discussion about investments during the nephew's visit and *83 said, "Those bonds are yours," or words to that effect. Only the two of them were present at the time. Nothing in the nature of a physical delivery of the bonds accompanied Mr. Berenblum's remark. They remained undisturbed in the tin box in the dining room cabinet.
When testifying in court Mrs. Berenblum was unable to fix a date or month or time of year when the bonds were moved from Newark to West Caldwell. On cross-examination her attention was called to a deposition taken in October 1961 in which she said the bonds were taken from the box "approximately a year and a half ago, I think." That estimate would place the episode in the spring of 1960. However, the record kept by the bank of visits to the box shows one made on July 27, 1959 and no other until May 26, 1960, the day Mr. Berenblum died.
The visit to the box on May 26, 1960 was made by Mrs. Berenblum after she knew her husband was dead. When asked by the vault attendant whether her husband was living she said he was, thus gaining access to the box. She then removed all of its contents. She next went to The Howard Savings Institution and withdrew $12,000 from the joint bank account already mentioned. By way of explanation of her conduct Mrs. Berenblum said that she followed the bad advice of people she considered good friends and was accompanied to the banks by her "advisors."
On the gift issue Mr. Keith gave significant testimony. He has been an employee of the Fidelity Union Trust Company for many years and was assigned to the Ironbound Branch until fairly recently. He became well acquainted with Mr. Berenblum and as a spare time activity performed services for him. They included bookkeeping work, looking after real estate while Mr. and Mrs. Berenblum were away from home, and going to the safe deposit box with Mr. Berenblum and clipping coupons on the latter's bonds. Mr. Keith participated in the clipping of coupons for about eight years. He testified that he never went to the box with Mr. Berenblum except to clip or assist with the clipping of the bond *84 coupons. He was uncertain about the exact date on which the clipping last took place at the bank's vault, but he was positive that his services to Mr. Berenblum had never included any clipping of coupons elsewhere.
The last visit Mr. Berenblum made to the safe deposit box was in July 1959. After that age and illness made trips to Newark difficult, if not impossible. Mr. Keith continued to see Mr. Berenblum, however, going to his home on Saturday afternoons and working between the approximate hours of one and five o'clock. The frequency of the visits ranged from once a week to once in three weeks. Among other things, Mr. Keith wrote checks to pay bills, made up deposits of rents received from numerous tenants, sent out delinquency notices to tenants and prepared income tax returns. He testified that several times he said to Mr. Berenblum that the bond coupons should be clipped. To that suggestion Mr. Berenblum would reply, "When I feel better." Nothing was ever said to Mr. Keith about the bonds' being in West Caldwell and, believing they were in the safe deposit box, he made no further mention of the coupons during the last six months or so of Mr. Berenblum's life because he realized that the latter lacked strength to make a trip to Newark. He testified that if the bonds had been at hand in West Caldwell, all the coupons could have been clipped in about half an hour, although preparation of a deposit slip would have taken somewhat longer. He never noticed a cabinet in the dining room, but conceded one might have been there without his taking particular notice of it.
Although there was no direct contradiction of Mrs. Berenblum's testimony that the bonds were taken to West Caldwell in her knitting bag, and sometime later were declared by her husband to be her property, that testimony may nevertheless be rejected. In re Perrone's Estate, 5 N.J. 514, 521-522 (1950). My conclusion is that it should be rejected. If it stood entirely alone, it would be unsatisfactory because of Mrs. Berenblum's inability to be more definite as to when the bonds were moved to West Caldwell and the lack of even a suggestion *85 of motive for exposing personal property of such great value to the risk of theft or loss. Moreover, Mr. Keith's testimony leads to disbelief of the claim that the bonds were moved out of the box before Mr. Berenblum's death. That testimony shows the care with which Mr. Berenblum attended to his business affairs within the limits of his failing strength. It is not believable that he would have allowed interest coupons on $168,000 of negotiable bonds to remain unclipped if the bonds had been in his home and readily accessible to him and Mr. Keith. Nor is it credible that he would have risked keeping so much value in an unsafe place.
I am satisfied the reason for neglecting the coupons was the continued presence of the bonds in the Newark safe deposit box, a place inaccessible to Mr. Berenblum because of his infirmities. That they were not in the box when it was opened after he died is explained by his widow's questionable visit to the vault on the day of death.
There was no inter vivos gift of the bonds and they are a part of the estate which the plaintiffs are charged with administering.